## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **CHRISTOPHER LACCINOLE,**<br><br>     **Plaintiff,**<br><br>**v.**<br><br>**CREDIT CONTROL, LLC,**<br><br>     **Defendant.** | **Case Nos.: 19-cv-00299**<br>**19-cv-00301**<br>**19-cv-00302**<br>**19-cv-00303**<br>**19-cv-00304**<br>**19-cv-00305** |

## DEFENDANT CREDIT CONTROL, LLC'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

COMES NOW Defendant, Credit Control, LLC ("Credit Control") and, pursuant to Fed. R. Civ. P. 56, hereby moves for judgment as a matter of law as to all claims asserted by Plaintiff Christopher Laccinole ("Plaintiff"). In support of its Motion, Credit Control submits the following Memorandum of Law.

### I.     INTRODUCTION

The facts presented in this case could not be simpler. A creditor places an account for collection. The agency makes phone calls in an attempt to reach the obligor on that account. Unfortunately, the agency has a wrong telephone number and mistakenly calls someone else. The typical recipient of such a call would inform the caller that she has dialed the wrong number or that the person she is attempting to reach cannot be reached at that number. If the calls continued, the recipient would understandably insist that the caller stop calling.

Plaintiff is not the typical call recipient. Instead, he is an experienced litigator. *See Laccinole v. Experian Info. Solutions, Inc.*, No. 15-337-M-LDA, 2017 US Dist. LEXIS 19688, 2017 WL 563962 (D. R.I. Feb. 10, 2017) (noting that Mr. Laccinole has been a plaintiff in 25 cases in this district in the last four years). Upon receiving a call, Plaintiff sent a letter to Credit Control

demanding that it stop calling him. This is certainly understandable, except that he did not specifically identify the phone number at which he received an unwanted call. Instead, he merely listed that number as a string of ten digits at the bottom of his letter, underneath his signature and address. It is beyond dispute that he provided the number, but the manner by which he did it seems odd considering his primary objective was presumably to stop calls to that number.

When the calls to his phone continued, Plaintiff did not say that the caller had a wrong number and did not confirm that he was not the person the caller was asking for. Instead, he started filing nearly identical lawsuits over each call. Plaintiff filed six suits in all, with the last suit involving two calls and not just one. Therefore, what started as a simple matter has evolved into unnecessarily complicated litigation. Each suit asserts fifteen separate counts, all of which fail as a matter of law.

## II.   STATEMENT OF FACTS

On January 4, 2019, one of Credit Control's clients placed an account owed by a person with the initials R.M. ("the Account").[1] *See* Declaration of Richard Saffer ("Saffer Declaration") at ¶ 8. The Saffer Declaration is submitted with this Motion as Exhibit 1. When attempting to reach R.M. to discuss the Account, Credit Control placed phone calls to a telephone number ending x8496 that belonged to Plaintiff ("Plaintiff's Number"). Saffer Decl. at ¶ 10, 26. Plaintiff received calls from Credit Control on February 14, 2019,[2] February 20, 2019,[3] February 22, 2019,[4] February 25, 2019,[5] February 26, 2019,[6] March 5, 2019,[7] March 13, 2019,[8] and March 14, 2019.[9]

---

[1] The obligor on the Account is referenced only by his initials to protect his privacy.
[2] *See* Exhibits 3-7 at ¶ 33.
[3] *See* Exhibit 2 at ¶ 28.
[4] *See* Exhibit 3 at ¶ 37.
[5] *See* Exhibit 4 at ¶ 37.
[6] *See* Exhibit 5 at ¶ 37.
[7] *See* Exhibit 6 at ¶ 37.
[8] *See* Exhibit 7 at ¶ 40.
[9] *See* Exhibit 7 at ¶ 45.

*See* Plaintiff's Complaints. For convenience and ease of reference, copies of Plaintiff's complaints are submitted with this Motion as Exhibits 2-7.

On February 19, 2019, Credit Control received a letter from Plaintiff. Saffer Declaration at ¶ 15. A copy of the Plaintiff's letter is attached to the Saffer Declaration as Exhibit B. Pursuant to Credit Control's policies and procedures related to disputes and related to requests to cease communication, Credit Control undertook a search for an account associated with Plaintiff. Saffer Declaration at ¶ 16. Credit Control does not have any accounts associated with Plaintiff's name and did not have any accounts associated with Plaintiff's name on February 19, 2019. Id. at ¶ 17. As a result, Credit Control was unable to locate an account for Plaintiff. *Id.*

Plaintiff's letter listed his phone number as a string of ten digits underneath his signature and address. *See* Exhibit B to Saffer Declaration. If Credit Control had located Plaintiff's Number within its systems, then Credit Control would have removed Plaintiff's Number from the Account so that no further calls would be placed to that number. *Id*. at 18. Unfortunately, perhaps due to the way his number was listed in his letter, Credit Control did not locate the number in its systems and additional calls followed. However, the failure to locate Plaintiff's Number within Credit Control's system was an unintentional error or oversight. *Id.*

Pursuant to its procedures, Credit Control mailed a letter on February 19, 2019 to Plaintiff to inform him that Credit Control was unable to locate an account and to please provide information to assist Credit Control in locating an account. *Id*. at ¶ 19. A copy of Credit Control's letter of February 19, 2020 is attached to the Saffer Declaration as Exhibit C. Credit Control's letter invited Plaintiff to return the letter with additional information or to call Credit Control at a toll-free number. *Id*. Plaintiff never responded to Credit Control's letter and never provided Credit Control with any additional information to assist it in locating an account. *Id*. at ¶ 20.

The transcripts of the recordings of Credit Control's calls with Plaintiff reflect that Plaintiff never identified himself during any call and he never said in any call that he was not R.M. or that Credit Control had dialed the wrong number. *Id.* at ¶ 24, Exhibit D to the Saffer Declaration.[10] Furthermore, at no point during any call did Plaintiff ask that Credit Control stop calling him or stop placing calls to Plaintiff's Number. *Id.* Credit Control first became aware that Plaintiff's Number was associated with the Account on May 14, 2019 when Credit Control was served with state-court complaints filed by Plaintiff. *Id.* at ¶ 25. After receipt of those complaints, Credit Control removed Plaintiff's Number from the Account and placed no further calls to Plaintiff's Number. *Id.*

All calls placed by Credit Control to Plaintiff's Number were made as part of an effort to reach R.M. with respect to the Account, and each time a Credit Control representative reached someone at Plaintiff's Number the representative asked to speak with R.M. *Id.* at ¶ 26. Credit Control never made any attempt to collect a debt from Plaintiff. Credit Control made no representations regarding the Account or any other debt to Plaintiff, nor did it use any means to collect any debt from Plaintiff. *Id.* at ¶ 27.

All call attempts made to Plaintiff's Number by or on behalf of Credit Control were made utilizing Ontario Systems, LLC's Manual Call Assist ("MCA"). Saffer Declaration at ¶ 10. Calls made utilizing MCA are human initiated and MCA is a human controlled system that requires an agent to manually initiate every call, either by typing all ten digits of the phone number or by clicking that number on the agent's screen. *Id.* at ¶ 11. MCA does not have the capacity to randomly or sequentially generate and dial cell phone numbers, and it cannot dial any numbers without human intervention. *Id.* at ¶ 12. All calls to Plaintiff's Number were manually dialed,

---

[10] The transcripts refer to called party as "R.M.," because the court reporter apparently also assumed that R.M. was on those calls. However, Credit Control presumes that this is Plaintiff.

either by typing ten digits or clicking the number on a screen. *Id.* at ¶ 13. Credit Control did not use an artificial or prerecorded voice for any calls placed to Plaintiff's Number. *Id.* at ¶ 14.

## III.   ARGUMENT

### A.   Summary Judgment Standard

Summary judgment is appropriate if the movant can show "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 255.

### B.   Plaintiff's TCPA Claims in Count I Fail as a Matter of Law Because Credit Control Did Not Use an ATDS or an Automatic or Prerecorded Voice.

In pertinent part, the TCPA prohibits the making of "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any *automatic telephone dialing system* or an artificial or prerecorded voice—(iii) to any number assigned to a...cellular telephone service... or any service for which the called party is charged for the call..." 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). Credit Control does not dispute

that it placed calls to Plaintiff's cellular telephone, nor does Credit Control contend that it had Plaintiff's prior express consent. However, Credit Control did not violate this section of the TCPA because it did not use an "automatic telephone dialing system" or an artificial or prerecorded voice to place calls to Plaintiff.

The term "automatic telephone dialing system" ("ATDS") is defined to mean "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The circuit courts are currently divided between those courts holding that equipment must use a random or sequential number generator to qualify as an ATDS and those courts holding that equipment can qualify as an ATDS if it merely has the capacity to store numbers and dial those numbers automatically. *See Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 121 (3d Cir. 2018) (evidence that a system in question sent messages only to numbers that had been inputted by a user was insufficient to survive summary judgment; plaintiff must present evidence showing that the system had "the present capacity to function as an autodialer by generating random or sequential telephone numbers and dialing those numbers."); *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, 1309-10 (11th Cir. 2020) (holding that a device must use "a random or sequential number generator" to store or produce numbers); *Gadelhak v. AT&T Servs.*, 950 F.3d 458, 469 (7th Cir. 2020) ("…the capacity to generate random or sequential numbers is necessary to the statutory definition."); *but see Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1053 (9th Cir. 2018) (holding that equipment qualifies as an ATDS if it has the capacity to store numbers to be called and dial those numbers automatically); *Duran v. La Boom Disco, Inc.,* 955 F.3d 279, 287 (2d Cir. 2020) ("…we hold that an ATDS may call numbers from stored lists, such as those generated, initially, by humans."); *Allan v. Pa. Higher Educ. Assistance Agency*, 968 F.3d 567, 573 (6th Cir.

2020) (finding that system at issue "would qualify as an ATDS because it stores numbers and dials those numbers.").

In each of his Complaints, Plaintiff alleges, "[u]pon information and belief, Credit Control uses a predictive dialer to contact plaintiff." *See* Ex. 2 at ¶ 31. A predictive dialer does not utilize a random or sequential number generator, but instead dials from a list of pre-determined numbers. *See Glasser*, 948 F.3d at 1308-09 (*citing In re TCPA Rules & Regulations*, 18 FCC Rcd. 14014, 14090-91). By alleging the use of a predictive dialer instead of a random or sequential number generator, Plaintiff fails to state a claim in three of the six circuits that have decided this issue (Third, Seventh, and Eleventh). *See Mosley v. Gen. Revenue Corp.*, No. 1:20-cv-01012-JES-JEH, 20 U.S. Dist. LEXIS 127055, *8-9 (C.D. Ill. Jul. 20, 2020) (explaining that following Seventh Circuit's decision in *Gadelhak*, TCPA plaintiffs must plausibly allege that defendant's equipment had the capacity to store or generate random or sequential phone numbers; and finding that it is not plausible that a company seeking to collect debts uses a system that randomly and sequentially generates phone numbers).

The Supreme Court will decide the above-described circuit split during its October 2020 term. *Facebook, Inc. v. Duguid*, No. 19-511, 2020 U.S. LEXIS 3559, 2020 WL 3865252 (Jul. 9, 2020).[11] The question the Supreme Court will decide is:

> Whether the definition of ATDS in the TCPA encompasses any device that can "store" and "automatically dial" telephone numbers, even if the device does not "us[e] a random or sequential number generator."

---

[11] A copy of the Order can be accessed at https://www.supremecourt.gov/orders/courtorders/070920zor_i425.pdf (last accessed Oct. 11, 2020).

*Facebook*, No. 19-511, Petition for Writ of Certiorari at ii.[12] However, this Court does not need to decide this issue in this case because the equipment used by Credit Control to place calls to Plaintiff's number requires too much human intervention to qualify as an ATDS.

A device must be able to dial numbers automatically, without human intervention, to qualify as an ATDS. *See Duran*, 955 F.3d at 287 ("Indeed, this ability to dial without human intervention is an ATDS's 'basic function.'") (citations omitted); *Marks*, 904 F.3d 1041, 1050 ("We must also determine to what extent the device must function without human intervention in order to qualify as an ATDS."). For example, the Eleventh Circuit examined the capabilities of the device at issue in *Glasser* and determined that it did not qualify as an ATDS because, among other things, it "required human intervention and thus was not an 'automatic' dialing system in the first place." *Glasser*, 948 F.3d at 1312. Summarizing its findings, the court explained:

> The technology before us requires meaningful human interaction to dial telephone numbers: An employee's choice initiates every call. Yes, the system dials the numbers itself. But no one would think that telling a smartphone to dial the phone number of a stored contact (or several contacts) means the smartphone has automatically dialed the number. Human intervention is necessary there, just as it is here, to initiate the call.

*Id.* Further, Judge William E. Smith of this District Court recently held that equipment cannot qualify as an ATDS if it requires too much human intervention. *DeCapua v. Metro. Prop. & Cas. Ins. Co.*, No. 18-590 WES, 2020 U.S. Dist. LEXIS 47695, *3 (D. R.I. Mar. 19, 2020). Judge Smith relied in part on the Eleventh Circuit's reasoning in *Glasser* and noted that "even where a system dials numbers itself, critical is that '[a]n employee's choice initiates every call.'" *Id.* (quoting *Glasser*, 948 F.3d at 1312).

---

[12] A copy of the Petition for Writ of Certiorari can be accessed at https://www.supremecourt.gov/DocketPDF/19/19-511/119361/20191017155036139_2019-10-17%20Facebook%20v.%20Duguid%20Petition%20FINAL.pdf (last accessed Oct. 11, 2020).

The equipment used by Credit Control to place calls to Plaintiff cannot place calls automatically. Saffer Declaration at ¶ 10-13. Rather, calls can only be placed by a Credit Control employee who must manually click on a telephone number to place a call to that number. *Id.*

It is well settled that a system that requires human intervention in the form of a manual click in order to launch a call does not qualify as an ATDS. The District of Massachusetts considered a system that similarly required a human "clicker agent" to manually click a button to place a call and held that "[t]his alone disqualifies" the system as an ATDS. *Hatuey v. IC Sys.*, No. 1:16-cv-12542-DPW, 2018 U.S. Dist. LEXIS 193713, *16; 2018 WL 5982020 (D. Mass. Nov. 14, 2018). Likewise, the Southern District of California held that a system that requires the intervention of clicker agents is incapable of non-manual dialing and "thus is not an ATDS." *Meier v. Allied Interstate, LLC*, No. 18-CV-1562-GPC-BGS, 2020 U.S. Dist. LEXIS 28249, *15; 2020 WL 819014 (S.D. Cal. Feb. 19, 2020). Indeed, multiple courts have scanned the legal landscape and observed that the courts are unanimous on this issue. *See, e.g., Collins v. Nat'l Student Loan Program*, 360 F. Supp. 3d 268, 273 (D. N.J. 2018) (citing multiple cases and noting that "every court to examine this issue has held that the clicker agent's role prevents the system from qualifying as an ATDS under the statute") (citations omitted); *Pozo v. Stellar Recovery Collection Agency, Inc.*, No. 8:15-cv-929-T-AEP, 2016 U.S. District LEXIS 146432, *9 (M.D. Fla. Sep. 2, 2016) (citing multiple cases and noting that "dialing systems which require agents to use an electronic 'point and click' function to initiate calls are not autodialers because human intervention is required to initiate the calls") (citations omitted).

Credit Control has established that all of its calls to Plaintiff's cellular phone were placed manually and that it did not use an artificial or prerecorded voice for any of those calls. Saffer Declaration at ¶ 10-14. At the summary judgment stage, Plaintiff's unsupported allegation that he

heard "clicks" or "pauses" are insufficient to rebut Credit Control's evidence demonstrating that all calls were placed manually. *Norman v. AllianceOne Receivables Mgmt.*, 637 Fed.Appx. 214, (7th Cir. 2015); *Martin v. Allied Interstate, LLC*, 192 F.Supp.3d 1296, 1308 (S.D. Fla. 2016) ("Courts have routinely rejected similar claims by plaintiffs who try to maintain a TCPA claim on the belief that an ATDS was used based on 'clicks,' 'delays,' or 'dead air' on the other end of the line.") (citations omitted). Likewise, his speculation that an artificial or prerecorded voice was used because the caller maintained the same "volume, intonation, and voice"[13] or because Credit Control wanted to "stall for time"[14] are likewise insufficient to survive summary judgment. *Dennis v. Reg. Adjustment Bureau, Inc.*, No. 09-61494-CIV-UNGARO, 2010 U.S. Dist. LEXIS 144776, *9-10 (S.D. Fla. Jun. 6, 2010) (holding that the plaintiff's belief that a call sounded prerecorded could not defeat summary judgment).

### C.    Plaintiff's TCPA Claims in Count I Fail as a Matter of Law Because Credit Control Did Not Make Solicitation or Telemarketing Calls.

Plaintiff's claims under 47 U.S.C. § 227(c)(5) and the prohibitions set forth in 47 C.F.R. § 64.1200 fail as a matter of law because Credit Control did not place solicitation or telemarketing calls to Plaintiff. Section (c) of the TCPA provides a private right of action for "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). The regulations at 47 C.F.R. § 64.1200(c) prohibit the initiation of a "telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained

---

[13] *See* Exhibit 5 at ¶ 41.
[14] *See* Exhibit 5 at ¶ 42.

by the Federal Government." Plaintiff asserts that Credit Control violated this regulation by placing calls to a number that is part of the do-not-call registry. See Exhibit 2 at ¶ 37.

The TCPA defines "telephone solicitation" to mean "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization." 47 U.S.C. § 227(a)(4). The Federal Communications Commission ("FCC") has explained that "calls solely for the purpose of debt collection are not telephone solicitations and do not constitute telemarketing. Therefore, calls regarding debt collection or to recover payments are not subject to the TCPA's separate restrictions on 'telephone solicitations.'" *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565, ¶ 11 (Jan. 4, 2008).

The Eleventh Circuit cited this FCC interpretation in affirming summary judgment in favor of a debt collector on a § 227(c)(5) claim. *Meadows v. Franklin Collection Serv.*, 414 F.Appx. 230, 236 (11th Cir. 2011). The plaintiff in *Meadows*, like Plaintiff here, was not the intended recipient of collection calls. *Id.* at 232. While the plaintiff in *Meadows* admitted that the defendant did not try to sell anything to her and did not offer her any services, she claimed that the defendant collection agency's calls to her were "implicit attempts to ask [her] to pay the debts herself" and that the defendant was "actually asking [her] to 'purchase her privacy and peace.'" *Id.* at 236. Nonetheless, the Eleventh Circuit held that summary judgment was proper because "the definition of a 'telephone solicitation,' especially in light of the FCC's ruling interpreting that definition, is

clear and does not include implicit 'purchases of peace' and investments in services that [defendant] never offered to Meadows." *Id.*

Credit Control did not encourage Plaintiff to purchase, rent, or invest in any property, goods, or services. Saffer Declaration at ¶ 28. Instead, Credit Control inadvertently called Plaintiff in attempts to reach another person who owed money to Credit Control's client. *Id.* at ¶ 26. Plaintiff essentially concedes that Credit Control's calls were made for the purpose of debt collection by asserting claims against Credit Control under the Fair Debt Collection Practices Act and the Rhode Island Fair Debt Collection Practices Act. Therefore, those calls are clearly exempted from the coverage of 47 U.S.C. § 227(c)(5) and Plaintiff's claims under that section, and under 47 C.F.R. § 64.1200(c) fail as a matter of law.

### D. Plaintiff's DTPA Claims in Count III Fail as a Matter of Law Because Plaintiff Was Not Subjected to a Deceptive Practice and He Has Not Suffered an Ascertainable Loss.

Plaintiff's cannot maintain claims under the Rhode Island Deceptive Trade Practices Act ("DTPA") because Plaintiff has not even pled, and he certainly cannot prove, that he was subjected to a deceptive practice or that he suffered any ascertainable loss of money or property. The DTPA "provides legal recourse to '[a]ny person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money [or] property, real or personal, as a result of the use or employment of a method, act, or practice declared unlawful by § 6-13.1-2.'" *Barreiro v. Jef Booth, P.C.*, No. 08-59ML, 2009 U.S. Dist. LEXIS 35925, *8, 2009 WL 982412 (D. R.I. Apr. 10, 2009) (*quoting* R.I. Gen. Laws § 6-13.1-5.2). "Examples of conduct prohibited under the DTPA include, inter alia, passing off goods or services as those of another, § 6-13.1-1(6)(i); causing likelihood of confusion as to the source of services or goods, § 6-13.1-1(6)(ii); representing that goods are original or new if they have been

altered, § 6-13.1-1(6)(vi); making false statements concerning price reductions, § 6-13.1-1(6)(xi);

or 'engaging in any act or practice that is unfair or deceptive to the consumer.' § 6-13.1-1(6)(xiii)."

*Id.* at *8-9. To state a claim under the DTPA, "Laccinole must allege (1) that he was the subject

of a deceptive practice or act in connection with the purchase of a service; and (2) that he suffered

an ascertainable loss of money or property as a result of the deceptive practice." *Laccinole v.*

*Assad,* No. 14-404 S, 2016 U.S. Dist. LEXIS 28363, *23 (D. R.I. Mar. 7, 2016) (citations omitted).

Plaintiff asserts that Credit Control "engaged in false representation or deceptive means to

obtain money from a consumer." *See* Exhibit 2 at ¶ 88. However, he cannot show that he was the

subject of any deceptive practice or act. "For conduct to be deceptive it must, among other things,

be likely to mislead a reasonable consumer and it must be material to a consumer's choices or

conduct." *Laccinole*, 2016 U.S. Dist. LEXIS 28363 at *23 (*citing Long v. Dell, Inc.*, 93 A.3d 988,

1003-04 (R.I. 2014)). Laccinole cannot identify any conduct that would be likely to mislead a

reasonable consumer. Credit Control did not attempt to collect a debt from Plaintiff, nor did it

attempt to sell or lease any goods or services to Plaintiff. Saffer Declaration at ¶ 27-29. The only

thing Credit Control asked of Plaintiff was that he verify his identity so that Credit Control could

confirm that it was speaking with the intended recipient. *See* Exhibit D to Saffer Declaration. A

reasonable consumer would easily understand that Credit Control's calls were directed to another

person and thus would not be misled or deceived by those calls. Therefore, Plaintiff has not

sufficiently alleged, nor can he prove, that the calls were deceptive in any way. For that reason

alone, Plaintiff's DTPA claims fail as a matter of law. *See Laccinole*, 2016 U.S. Dist. LEXIS 28363

at *23 (dismissing DTPA claim because "Laccinole has not alleged any facts that would mislead

an objectively unsophisticated consumer," much less a reasonable consumer); *Laccinole v. Twin*

*Oaks Software Dev., Inc.*, No. 13-716ML, 2014 U.S. Dist. LEXIS 73879, *38 (D. R.I. May 1,

2014) (finding that DTPA claim fails as a matter of law "because Mr. Laccinole has utterly failed to present a scintilla of competent evidence of unfair or deceptive practices").

Furthermore, Plaintiff's DTPA claims also fail because although Plaintiff alleges that Credit Control's calls caused him "anxiety, frustration and annoyance," he does not allege that he suffered any ascertainable loss of money or property. *See* Exhibit 2 at ¶ 38. Therefore, Plaintiff fails to satisfy the second element of his purported DTPA claims. *See Laccinole*, 2014 U.S. Dist. LEXIS 73879, *37 (finding that Plaintiff's "RI-DTPA claim founders on his failure to allege or present competent evidence of 'ascertainable losses of money or property, real or personal,' which is an essential element of a private right of action under the Act"); *Barreiro*, 2009 U.S. Dist. LEXIS 35925 at *9 (denying default judgment on DTPA claim because Plaintiff did not allege "that she suffered 'any ascertainable loss of money or property, real or personal' as a result of Booth, P.C.'s contact with members of her husband's family, nor does such conduct appear to fall within the defined unlawful acts and practices that the DTPA is intended to prevent").

**E.    Plaintiff's Right to Privacy Claims in Count IV Fail as a Matter of Law Because Credit Control's Calls Were Not Offensive or Objectionable to a Reasonable Person.**

To recover for violation of his right to privacy, Plaintiff must prove that "(A) [Credit Control's conduct" was an invasion of something that is entitled to be private or would be expected to be private; (B) The invasion was or is offensive or objectionable to a reasonable man." R.I. Gen. Laws § 9-1-28.1(a)(1)(i). Plaintiff has merely alleged that he received a few unwanted calls on his cellular phone. He has not alleged any facts demonstrating how those calls invaded something that is entitled to be private or would be expected to be private. Because the calls were to his cellular phone, it is expected that some or perhaps all of them were received when Plaintiff was in public

or otherwise had no expectation of privacy. *Swerdlick v. Koch*, 721 A.2d 849, 857-58 (R.I. 1998) (photographing activities "in plain view of the public" not an unreasonable intrusion).

Credit Control is aware of only one case applying Rhode Island's privacy statute to calls to a cellular telephone, and the facts of that case are easily distinguished from Plaintiff's allegations in this case. *See Laccinole v. Appriss, Inc.*, No. 19-605 WES, 2020 U.S. Dist. LEXIS 64238 (D. R.I. Apr. 13, 2020). There, Judge Smith held that Plaintiff stated a claim under the privacy statute by alleging that Appriss called him more than sixty times after he asked to receive no further calls, that at least thirty times Appriss called him thirty seconds after he terminated a prior call, and that on one day Appriss called him once per hour for thirteen consecutive hours. *Id.* at *14. Here, by contrast, Plaintiff alleges (across all six cases)[15] a total of 8 calls over the course of one month. *See* Exhibits 3-7 at ¶ 33, Exhibit 2 at ¶ 28, Exhibit 3 at ¶ 37, Exhibit 4 at ¶ 37, Exhibit 5 at ¶ 37, Exhibit 6 at ¶ 37, Exhibit 7 at ¶ 40, Exhibit 7 at ¶ 45. Also, Plaintiff does not allege that Credit Control ever called him more than one time in a single day. *See*, generally, Complaints at Exhibits 2-7.

In applying the privacy statute to phone calls, Judge Smith observed that "the R.I. Supreme Court has elsewhere drawn approvingly on the Restatement (Second) of Torts § 652B in its unreasonable intrusion analysis." *Laccinole*, 2020 U.S. Dist. LEXIS 64238 at *14. Judge Smith also noted that "[t]he Restatement indicates that repeated unwanted telephone calls may constitute unreasonable intrusions upon seclusion," with the question turning "largely on whether the reasonable person would find the 'persistence and frequency' of the calls offensive." *Id.* (*citing* Restatement (Second) of Torts § 652B cmt. b, illustration 5, and cmt. d). The illustration cited by Judge Smith describes the following scenario:

> A, a professional photographer, seeking to promote his business, telephones B, a lady of social prominence, every day for a month, insisting that she come to his

---

[15] By splitting his privacy claim across six separate actions, Plaintiff considerably weakens that claim. However, even if all calls were combined into one action, this claim would still fail as a matter of law.

> studio and be photographed. The calls are made at meal times, late at night and at other inconvenient times, and A ignores B's requests to desist. A has invaded B's privacy.

Restatement (Second) of Torts § 652B cmt. b, illustration 5. The call frequency described in this illustration is comparable to the call frequency alleged by Plaintiff in his case against Appriss, but goes far beyond the frequency alleged against Credit Control.

> The Restatement also explains at comment d:
>
>> There is likewise no liability unless the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable man would strongly object. Thus there is no liability for knocking at the plaintiff's door, or calling him to the telephone on one occasion or even two or three, to demand payment of a debt. *It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff, that becomes a substantial burden to his existence, that his privacy is invaded.*

Restatement (Second) of Torts § 652B cmt. d (emphasis added). No reasonable person would find 8 calls over the course of a month to be highly offensive or to amount to a "course of hounding" or a "substantial burden to his existence." *Id*. It is also clear that Plaintiff did not find the calls to be highly offensive because, outside of his letter, he never told any of the callers that they had the wrong number or that he wanted the calls to stop. Saffer Declaration at ¶ 24. Instead, he simply confirmed that he had the company's name for his series of lawsuits. See Exhibit D to Saffer Declaration; Complaints at Exhibits 2-7. For Plaintiff, the calls were not offensive, they were opportunity. Because Credit Control's calls did not invade Plaintiff's privacy and were not offensive or objectionable to a reasonable person, Plaintiff's claims under the privacy statute fail as a matter of law.

**F.      All of Plaintiff's Claims under the FDCPA Must be Dismissed because Plaintiff Cannot Prove that the Subject Obligation is a "Debt" as Defined by the FDCPA**

The FDCPA defines a "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to a judgment." 15 U.S.C. § 1692a(5). Therefore, by its own terms, "the FDCPA applies to only consumer debt for personal, family or household purposes and not to commercial debt." *Martin v. Berke & Spielfogel*, No. 95-0005, 1995 U.S. Dist. LEXIS 4678, at *11, 1995 WL 214453 (E.D. Pa. Apr. 4, 1995) (*citing Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163, 1168-69 (3d Cir. 1987); *see also Parham v. Seattle Serv. Bureau*, 656 F.Appx. 474 (11th Cir. 2016) (affirming dismissal of claims under FDCPA and Florida counterpart due to plaintiff's failure to plead facts demonstrating that the alleged debt arose as the result of a consumer transaction). To determine "whether a particular debt is a consumer or business debt, courts examine the underlying transaction which created the document." *Horton v. Trans Union, LLC*, No. 12-2072, 2015 U.S. Dist. LEXIS 29564, at *16, 2015 WL 1055776 (E.D. Pa. Mar. 10, 2015) (citations omitted). Also, "[a] primary focus of this inquiry is the intended use of the debt." *Id.*

Importantly, the plaintiff bears the burden of proving that the subject obligation is a "debt" as defined by the FDCPA. *Id.* (*citing Anderson v. AFNI, Inc.*, No. 10-4064, 2011 U.S. Dist. LEXIS 51368, at *37-39 (E.D. Pa. May 11, 2011)). Indeed, one circuit court has repeatedly called this a "threshold requirement for application of the FDCPA." *Zimmerman*, 834 F.2d at 1167; *see also Gorbaty v. Portfolio Recovery Assocs., LLC*, 335 Fed.Appx. 580, 581 (3d Cir. 2009); *Pollice v. National Tax Funding, L.P.*, 225 F.3d 379, 400 (3d Cir. 2000). However, Plaintiff has not alleged any facts regarding the underlying debt, and he undertook no effort to discover the nature of the

underlying debt. Because Plaintiff cannot offer any evidence whatsoever to demonstrate that the underlying obligation related to a consumer debt, all of his claims under the FDCPA fail as a matter of law. In the unlikely event Plaintiff can meet this threshold requirement, Credit Control addresses each of his FDCPA claims in turn.

### G.   Plaintiff's FDCPA Claims in Count V Fail as a Matter of Law Because Credit Control Did Not Place Calls with an Intent to Annoy, Abuse, or Harass Plaintiff.

15 U.S.C. § 1692d generally prohibits collectors from engaging "in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." This section also contains a non-exhaustive list of conduct that violates the statute. That list includes § 1692d(5), which forbids "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." To prove a violation of this section, Plaintiff must "demonstrate an *intent* to annoy, harass or abuse." *Litt v. Portfolio Recovery Associates, LLC*, 146 F. Supp. 3d 857, 872 (E.D. Mich. 2015) (emphasis in original). Plaintiff can "demonstrate the requisite intent by showing tactics that are generally 'intended to embarrass, upset, or frighten' and that are likely to cause 'suffering and anguish.'" *Boozer v. Enhanced Recovery Co., LLC*, No. 17-cv-14190, 2019 U.S. Dist. LEXIS 180893, *27; 2019 WL 5295730 (E.D. Mich. Oct. 18, 2019) (*quoting Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 330 (6th Cir. 2006)). Furthermore, a determination of whether § 1692d has been violated "'turns not only on the volume of calls made, but also on the pattern of calls.'" *Hatuey*, 2018 U.S. Dist. LEXIS 193713 at *6 (*quoting Akalwadi v. Risk Management Alternatives, Inc.*, 336 F. Supp. 2d 492, 505 (D. Md. 2004)). "A pattern of phone calls that suggests the debt collector was trying, albeit persistently, to contact the consumer does not give rise to liability under the FDCPA, even if there were dozens — or hundreds - of calls over

a relatively short period of time." *Id.* (*citing Clingaman v. Certegy Payment Recovery Services*, 2011 U.S. Dist. LEXIS 56368, 2011 WL 2078629, *4 (S.D. Tex. 2011).

Although a caller's intent is often a question for the jury, "courts have awarded defendants summary judgment where the volume and pattern of calls demonstrates an intent to contact debtors rather than an intent to annoy, abuse, or harass them." *Ashlund v. I.C. Sys.*, No. 3:17cv65 (JBA), 2018 U.S. Dist. LEXIS 119605, *10; 2018 WL 3448163 (D. Conn. Jul. 17, 2018) (citations omitted). One of those cases, *Boozer v. Enhanced Recovery Co., LLC*, presents allegations similar to those alleged by Plaintiff. In *Boozer*, the plaintiff alleged that the defendant collector called his cell phone multiple times in an attempt to reach a debtor. *Boozer*, 2019 U.S. Dist. LEXIS 180893 at *3-4. The plaintiff in Boozer also testified that he spoke several times with representatives of the collector and that on each call he told them that they had the wrong number and to remove his number. *Id.* at *5. In response, the collector assured him multiple times that they would remove his number. *Id.* Mr. Boozer testified that he received ten to fifteen calls over two months after telling the collector between two and four times that it had the wrong number. *Id.* at *31. The court noted that Mr. Boozer's testimony was contradicted by the call records but found that "[e]ven without discounting Mr. Boozer's testimony, the allegation that Mr. Boozer continued to receive calls from ERC after telling it that he was not Debtor is insufficient to establish a violation of § 1692d in this Circuit." *Id.* at *31-32. The court in *Boozer* further observed that there were no allegations of threats or other abusive or harassing conduct, also noting that "there is not even an allegation that ERC informed Mr. Boozer that it was attempting to collect a debt." *Id.* at 31. The court reasoned that eight to fifteen calls over two months, without more, do not amount conduct the natural consequence of which is to harass, oppress, or abuse a person." *Id.* at 30-31; *see also Williams v. Web Equity Holdings, LLC*, No. 2:13-cv-13723, 2014 U.S. Dist. LEXIS 107078, *9-

10, 2014 WL 3845952, at *4 (E.D. Mich. 2014) (holding that five calls to debtor's father who shared debtor's name in a one-month period was not a violation of § 1692d(5) even when father always informed collector that it was calling the wrong Ernest Williams).

In this case, it is clear that Credit Control did not intend to harass, oppress, or abuse Plaintiff. Instead, the evidence demonstrates that Credit Control did not intend to contact Plaintiff at all but was instead trying to reach the actual debtor. Saffer Declaration at ¶ 26. Although Credit Control received Plaintiff's letter, the uncontradicted evidence demonstrates that Credit Control was unable to locate an account associated with Plaintiff. *Id.* at ¶ 17. Due to error, Credit Control did not discover that Plaintiff's number was associated with R.M.'s account. *Id.* at ¶ 18. Therefore, it was unable to remove Plaintiff's number from that account. *Id.*

Credit Control's error is not indicative of an *intent* to harass, oppress, or abuse Plaintiff. *See Hatuey,* 2018 U.S. Dist. LEXIS 193713 at *9-10. In *Hatuey,* the collector called the plaintiff in an effort to reach the actual debtor. *Id.* at *1-2. After the plaintiff informed the collector that it had the wrong number, the collector stopped calling. Id. at *9. However, the collector had a second account for the debtor and subsequently commenced calls to the plaintiff on that second account. Id. After the plaintiff again demanded that the collector cease calling, he received no further calls. Id. The court in Hatuey found that "[t]he fact that ICS did not identify the two accounts as both listing the same incorrect phone number is not sufficient to show an intent to 'harass, oppress, or abuse.' At most, this evidences that ICS was careless in cross-referencing the phone numbers in its database, but it does not evidence that ICS acted with ill will" *Id.* at *10 (*citing Kenny v. Mercantile Adjustment Bureau, LLC,* 2013 U.S. Dist. LEXIS 62415, 2013 WL 1855782, *3 (W.D.N.Y. 2013). The case cited by the *Hatuey* court, *Kenny,* likewise demonstrates that innocent

mistakes do not create a reasonable "inference of intent to annoy, abuse, or harass," but instead demonstrate, "at most, negligence." *Kenny*, 2013 U.S. Dist. LEXIS 62415 at *10.

Furthermore, other than the letter, Plaintiff never asked Credit Control to stop calling him. Saffer Declaration at ¶ 24. As a result, Credit Control did not know that it had the wrong number for R.M. until it was served with Plaintiff's state-court complaints on May 14, 2019. *Id.* at ¶ 25. Based on this uncontroverted evidence, no reasonable jury could find that Credit Control acted with the intent to harass, oppress, or abuse Plaintiff. Therefore, Credit Control is entitled to summary judgment in its favor with respect to Plaintiff's claims under § 1692d.

**H.      Plaintiff's FDCPA Claims at Count VI Fail as a Matter of Law Because Plaintiff Lacks Standing to Maintain a Claim Under 15 U.S.C. § 1692c.**

15 U.S.C. § 1692c regulates the manner in which a debt collector communicates with a "consumer." Among other things, this section empowers a "consumer" to cease communications from a debt collector by notifying the collector in writing that he refuses to pay the debt or wishes the collector to cease further communication. 15 U.S.C. § 1692c(c). Within the FDCPA, the term "consumer" is defined to mean "any natural person obligated or allegedly obligated to pay a debt." to pay the debt that Credit Control sought to collect. 15 U.S.C. § 1692a(3). As noted elsewhere, Credit Control never alleged that Plaintiff was obligated to pay the debt owed by the person it was trying to reach and it never attempted to collect that debt from Plaintiff. Saffer Declaration at ¶ 27. Therefore, Plaintiff does not have standing to bring a claim under this section of the FDCPA. *Wright v. Finance Serv. of Norwalk, Inc.*, 22 F.3d 647, 649, n. 1 (6th Cir. 1994) (noting that "only a 'consumer' has standing to sue for violations of § 1692c). Because Plaintiff lacks standing to enforce alleged violations of § 1692c, his claims under that section fail as a matter of law.

I.      **Plaintiff's FDCPA Claims at Count VII Fail as a Matter of Law Because Credit Control Did Not Make Any Actionable Representations to Plaintiff.**

To state a claim under this section of the FDCPA, a plaintiff must allege that the defendant used a "false, deceptive, or misleading representation or means in the collection of any debt." *Manlapaz v. Unifund CCR Partners*, No. 08 C 6524, 2009 U.S. Dist. LEXIS 85527, *7, 2009 WL 3015166 (N.D. Ill. Sep. 15, 2009) (*quoting* 15 U.S.C. 1692e). In this count, Plaintiff alleges that "Defendants (sic) violated the restrictions the FDCPA imposes on them prohibiting them from making false, deceptive, or misleading representations." *See* Exhibit 2 at ¶ 110. Plaintiff also alleges that he "suffered damages as a result of the conduct alleged in this Count." *Id.* at ¶ 112. However, Plaintiff does not allege any conduct in this Count. *Id.* at ¶¶ 109-112. While Plaintiff incorporates all preceding paragraphs of his Complaint into this count, he also fails to identify any false, deceptive, or misleading representations in any preceding paragraph. Furthermore, Credit Control never made any representations to Plaintiff, nor did it use any collection means whatsoever with respect to Plaintiff. Saffer Declaration at ¶ 27.

A plaintiff cannot maintain a claim under § 1692e when even the least sophisticated consumer would understand that the collector was not trying to collect a debt from him. *Kaniewski v. Nat'l Action Fin. Servs.*, 678 F. Supp. 2d 541, 546 (E.D. Mich. 2009) (holding that § 1692e claims fail because plaintiff knew that defendant was not attempting to collect a debt against him); *see also Jones v. Revenue Assistance Corp.*, No. 14-10218-GAO, 2016 U.S. Dist. LEXIS 93946, *12 (D. Mass. Apr. 13, 2016). During each call, Credit Control asked to speak with R.M., which clearly signaled that Plaintiff was not the intended target of any debt collection efforts. *See* Exhibit D to Saffer Declaration. Because Plaintiff has not identified any false, deceptive, or misleading representation or means and because even the least sophisticated consumer in would understand

that another person was the target of any collection efforts, Plaintiff's claims under 15 U.S.C. § 1692e fail as a matter of law.

**J.     Plaintiff's FDCPA Claims at Count VIII Fail as a Matter of Law Because Plaintiff Lacks Standing to Maintain a Claim Under 15 U.S.C. § 1692g.**

Plaintiff alleges that Credit Control violated § 1692g(a) by failing to send a written notice of the debt (the "validation notice") within five days of its initial communication with him. *See* Exhibit 2 at ¶ 115. He also alleges that Credit Control violated § 1692g(b) by not verifying the debt and by continuing to collect the debt after Plaintiff disputed the debt. *Id.* at ¶ 114. However, Plaintiff cannot maintain claims under this section of the FDCPA because he is not a "consumer" as that term is defined in the FDCPA.

By its terms, § 1692g, like § 1692c discussed above, only regulates communications with "consumers." Therefore, only consumers have standing to bring claims under this section. *Montgomery v. Huntington Bank*, 346 F.3d 693, 697 (6th Cir. 2003) (holding that plaintiff lacked standing under § 1692g because he did not allege that he was obligated or allegedly obligated to pay the debt); *Kaniewski*, 678 F. Supp. 2d at 545 (finding that plaintiff, who received calls intended for the actual debtor, lacked standing to assert claims under § 1692g because he was not obligated, or alleged to be obligated, to pay any debt). As demonstrated above in Section H, Plaintiff is not a consumer. As a result, his claims under 15 U.S.C. § 1692g fail as a matter of law.

**K.     Plaintiff's FDCPA Claims at Count IX Fail as a Matter of Law Because Plaintiff Cannot Prove that Credit Control Used Any Unfair or Unconscionable Means.**

In this count, Plaintiff alleges that "Defendants (sic) violated the restrictions the FDCPA imposes on them prohibiting Defendants (sic) from using unfair or unconscionable means while attempting to collect a debt." *See* Exhibit 2 at ¶ 119. Plaintiff also alleges that he "suffered damages as a result of the conduct alleged in this Count." *Id.* at ¶ 121. However, Plaintiff does not allege

any conduct in this Count. *Id.* at ¶¶ 119-121. While Plaintiff incorporates all preceding paragraphs of his Complaint into this count, he also fails to identify any unfair or unconscionable means in any preceding paragraph. Regardless, Plaintiff cannot maintain claims under § 1692f because even the least sophisticated consumer would understand that he was not the target of collection efforts. *Hill v. Javitch*, 574 F. Supp. 2d 819, 826 (S.D. Ohio 2008) (dismissing § 1692f claim where it was clear that collection lawsuit was not directed to plaintiff); *see also Kaniewski*, 678 F. Supp. 2d at 545 (dismissing § 1692f claim where plaintiff knew that calls were not intended for him).

**L.      Plaintiff's Missouri Merchandising Practices Act Claims at Count X Fail as a Matter of Law Because Plaintiff Cannot Prove the Elements of a Claim.**

Plaintiff alleges that "Defendants (sic) acted willfully in refusing to comply with the MMPA" and that he "suffered damages as a result of the conduct described in this count." *See* Exhibit 2 at ¶ 123. However, Plaintiff does not identify any conduct within this count, or elsewhere in his Complaint, that violated the MMPA. Regardless, Plaintiff's claims under the MMPA fail because he cannot show that any of Credit Control's conduct was "in connection with the sale or advertisement of any merchandise in trade or commerce…in or from the state of Missouri." Mo. Rev. Stat. § 407.020(1). The Supreme Court of Missouri has explained that debt collection conduct is governed by the MMPA when the collection efforts are in connection with a sale that is subject to that statute. *Jackson v. Barton*, 548 S.W.3d 263, 270 (Mo. 2018). However, the party bringing the claim must present "evidence of a sale or attempted sale of goods or merchandise in trade or commerce." *State v. Kowalski*, 587 S.W.3d 709, 716 (Mo. Ct. App. 2019).

Plaintiff alleges that "Plaintiff has never had a business relationship with Credit Control" and that "Plaintiff does not owe Defendant any money." *See* Exhibit 2 at ¶¶ 14, 24. Importantly, Plaintiff does not and cannot present evidence of a sale of goods or merchandise. To the contrary, Plaintiff implies that Credit Control attempted to collect a debt from him when he owed no debt.

To the extent this is his claim, he has pled himself out of the MMPA. *See Kowalski*, 587 S.W.3d at 716 (noting that the State's charging document revealed the absence of a sale by alleging that the defendant "concealed the material fact that [defendant] had not provided goods and services to [the victim]").

Furthermore, by its terms the statute only applies to a sale of goods in or from the state of Missouri. Mo. Rev. Stat. § 407.020(1). However, Plaintiff asserts that the conduct of which he complains took place in Washington County, Rhode Island. *See* Exhibit 2 at ¶ 12. Plaintiff does not allege that Credit Control's calls were in any way in connection with a sale in or from Missouri.

Finally, the MMPA's private right of action applies only to a person who "purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020." Mo. Rev. Stat. § 407.025(1). Plaintiff has not alleged, and cannot prove, that the debt collection efforts were related to any purchase or lease of merchandise for personal, family or household purposes. Furthermore, as discussed at Section D, Plaintiff has not alleged and cannot prove an ascertainable loss. For the foregoing reasons, Plaintiff's claims under the MMPA fail as a matter of law.

**M.   All of Plaintiff's Claims under the RIFDCPA Must be Dismissed because Plaintiff Cannot Prove that the Subject Obligation is a "Debt" as Defined by the RIFDCPA**

The RIFDCPA defines a "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to a judgment." R.I. Gen. Laws § 19.14.9-3(4). As with the FDCPA, by its own terms the RIFDCPA applies only to consumer debts. Therefore, as

demonstrated above in Section F, all of Plaintiff's claims under the RIFDCPA fail for the same reason that his FDCPA claims fail.

In the unlikely event Plaintiff can meet this threshold requirement, Credit Control addresses each of his RIFDCPA claims in turn. Each of his RIFDCPA claims is duplicative of a corresponding claim under the FDCPA and fails for the same reasons. Furthermore, if Plaintiff is able to recover damages under the FDCPA then he cannot obtain additional damages under the RIFDCPA. R.I. Gen. Laws § 19-14.9-5 ("The policy of this state is not to award double damages under this article and the [FDCPA]. No damages under this section shall be recovered if damages are recovered for a like provision of said federal act."). Therefore, if any of Plaintiff's FDCPA claims survive summary judgment, this Court should dismiss the corresponding RIFDCPA claim or strike Plaintiff's claim for damages under that corresponding claim.

**N.** **Plaintiff's RIFDCPA Claims at Count XI Fail as a Matter of Law for the Same Reasons that His FDCPA Claims at Count VI Fail.**

Plaintiff's claims under this section of the RIFDCPA are duplicative of his claims under § 1692c (Count VI). *See* Exhibit 2 at ¶¶ 102-108, 125-131. Therefore, Plaintiff's claims under § 19-14.9-5 fail for the same reasons as discussed at Section H.

**O.** **Plaintiff's RIFDCPA Claims at Count XII Fail as a Matter of Law for the Same Reasons that His FDCPA Claims at Count V Fail.**

Plaintiff's claims under this section of the RIFDCPA are duplicative of his claims under § 1692d (Count V). *See* Exhibit 2 at ¶¶ 97-101, 132-136. Therefore, Plaintiff's claims under § 19-14.9-6 fail for the same reasons as discussed at Section G.

**P.     Plaintiff's RIFDCPA Claims at Count XIII Fail as a Matter of Law for the Same Reasons that His FDCPA Claims at Count VII Fail.**

Plaintiff's claims under this section of the RIFDCPA are duplicative of his claims under § 1692e (Count VII). *See* Exhibit 2 at ¶¶ 109-112, 137-140. Therefore, Plaintiff's claims under § 19-14.9-7 fail for the same reasons as discussed at Section I.

**Q.     Plaintiff's RIFDCPA Claims at Count XIV Fail as a Matter of Law for the Same Reasons that His FDCPA Claims at Count IX Fail.**

Plaintiff's claims under this section of the RIFDCPA are duplicative of his claims under § 1692f (Count IX). *See* Exhibit 2 at ¶¶ 118-121, 141-144. Therefore, Plaintiff's claims under § 19-14.9-8 fail for the same reasons as discussed at Section K.

**R.     Plaintiff's RIFDCPA Claims at Count XV Fail as a Matter of Law for the Same Reasons that His FDCPA Claims at Count VIII Fail.**

Plaintiff's claims under this section of the RIFDCPA are duplicative of his claims under § 1692g (Count VIII). *See* Exhibit 2 at ¶¶ 113-117, 145-149. Therefore, Plaintiff's claims under § 19-14.9-9 fail for the same reasons as discussed at Section J.

**S.     Plaintiff Has Engaged in Impermissible Claim Splitting.**

This is not the first time that Plaintiff has attempted to split his claims into multiple lawsuits. In another case in which Plaintiff employed this strategy, this Court noted that Plaintiff's strategy amounts to impermissible claim splitting and dismissed all of his complaints save the first one. *See Laccinole v. Diversified Consultants, Inc.*, No. 1:19-CV-00149-MSM-LDA, 2020 U.S. Dist. LEXIS 65173 (D. R.I. Apr. 14, 2020). To the extent that any of Plaintiff's claims survive summary judgment, Credit Control requests that this Court dismiss the five later filed complaints for the reasons outlined in the above-referenced decision.

Defendant, Credit Control, LLC
By its Attorneys,

/s/ Marc D. Wallick
Marc D. Wallick, Esq. (#2152)
WALLICK & ASSOCIATES, LTD.
51 Jefferson Boulevard, 1st Floor
Warwick, Rhode Island 02888
(401) 461-0100
wallicklaw@aol.com

/s/ M. Brent Yarborough
M. Brent Yarborough, *pro hac vice*
Maurice Wutscher LLP
420 N. 20th Street, Suite 2200
Birmingham, Alabama 35203
(205) 451-0389
byarborough@mauricewutscher.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2020, I filed this document using the CM/ECF System which will provide electronic notice to all counsel of record.

/s/ Marc D. Wallick
Marc D. Wallick, Esq. (#2152)